**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

LUIS GARCIA,                    :
                                :
        **Plaintiff**           :        **No. 4:10-CV-02012**
                                :
    **vs.**                     :        **(Judge Caldwell)**
                                :
MICHAEL J. ASTRUE,              :
COMMISSIONER OF SOCIAL          :
SECURITY,                       :
                                :
        **Defendant**           :

<u>MEMORANDUM AND ORDER</u>

<u>BACKGROUND</u>

        The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Luis Garcia's claim for social security disability insurance benefits and supplemental security income benefits. Tr. 1-3 and 12-22.[1]  For the reasons set forth below we will affirm the decision of the Commissioner.

        Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  There are inconsistent statements in the record regarding when Garcia's

_____

1.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on December 13, 2010.

insured status expired.[2]  However, the inconsistencies do not impact our disposition of the case.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Garcia was born on March 5, 1975, and at all times relevant to this matter was considered a "younger individual"[3] whose age would not seriously impact his ability to adjust to other work.  20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 30 and 78.  Garcia graduated from high school in 1992 and can, read, write, speak and understand the English language and perform basic mathematical functions. Tr. 31, 101 and 107.  After graduating from high school, Garcia had job training in telecommunications and worked as an installer of cable and communications equipment.

---

2.  The administrative law judge in her decision stated that Garcia was fully insured through December 31, 2008. Tr. 14. However, a document entitled "DISCO DIB Insured Status Report" states that Garcia was last insured on December 31, 2011. Tr. 94.

3.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Tr. 30-31 and 102.  The installer position was classified by a

vocational expert as semiskilled, medium work activity.[4]  Tr. 47.

---

4.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

   (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

   (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

   (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

   (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

   (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50

(continued...)

Records of the Social Security Administration reveal that Garcia had employment in the years 1989, 1991, 1994 through 1999, and 2001 through 2006. Tr. 93.  Garcia's earnings were as follows: $120.00 in 1989, $799.50 in 1991, $2824.50 in 1994, $1063.88 in 1995, $14,321.55 in 1996, $22,498.76 in 1997, $16,865.74 in 1998, $34,242.34 in 1999, $45,370.52 in 2001, $62,330.74 in 2002, $67,978.57 in 2003, $58,948.03 in 2004, $25,610.30 in 2005, and $19,080.47 in 2006. Tr. 93.  His total earnings were $372,054.90. Id.  No explanation was provided for Garcia's lack of earnings in the year 2000.[5]

Garcia stated that he worked as a cable installer from sometime in 1995 to March, 2006, but that he stopped working on August 4, 2006. Tr. 102. The record is unclear as to whether he worked as a cable installer from March to August 4, 2006. Id. The administrative law judge found Garcia earned $19,080.49 in 2006 and that such amount was earned prior to August 4, 2006. Tr. 14.

Garcia stated in his application for supplemental security income benefits that he received unemployment compensation in the amount of $2000 in August of 2006, and he

---

4.   (...continued)
          pounds or more.  If someone can do very heavy work, we
          determine that he or she can also do heavy, medium,
          light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

5.  It appears Garcia may have been engaged in telecommunications job training during the year 2000. Tr. 107.

testified at the administrative hearing that he received
unemployment compensation for six months. Tr. 32 and 75-76.  The
unemployment compensation was paid under New York state law. Id.[6]

Garcia claims that he became disabled on August 4, 2006,
because of a "crushed right foot" and "lower back problems"
sustained after a Yamaha Rhino 4-wheeler (all terrain vehicle
(ATV)) on which he was riding "flipped."[7] Tr. 30, 62, 102, 143 and
167.  The ATV allegedly landed on his right foot. Id.  Garcia also
claims that he "can't walk" and that he has neck problems. Tr. 42
and 102.  Garcia has not worked since the ATV accident.[8]

Garcia protectively filed his applications for
disability insurance benefits and supplemental security income
benefits on August 4, 2006.[9] Tr. 54, 57 and 74-83.  The

---

6.  Under New York law "no benefit shall be payable to any
claimant who is not capable of work or who is not ready, willing
and able to work his usual employment or in any other for which
he is reasonably fitted by training and experience." NY Labor Law
§ 591 (McKinney 2003). Furthermore, benefits may "be paid only to
a claimant who is totally unemployed[.]" Id.

7.  The accident apparently happened on August 3, 2006. Tr. 142-
143.

8.  The fact that Garcia collected unemployment compensation
after his alleged disability onset date of August 4, 2006,
suggests that he was able and willing to accept employment.

9.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.  The applications are dated August 15, 2006.
However, "Disability Determination and Transmittal" sheets give
an earlier date of August 4, 2006, which we assume is the
(continued...)

applications were initially denied by the Bureau of Disability Determination on January 26, 2007.[10]   Tr. 58-66.   On March 14, 2007, Garcia requested a hearing before an administrative law judge. Tr. 68.   After about 17 months had elapsed, a hearing was held before an administrative law judge on August 5, 2008. Tr. 23-53.   On December 18, 2008, the administrative law judge issued a decision denying Garcia's applications. Tr. 12-22.   On January 7, 2009, Garcia filed a request for review with the Appeals Council. Tr. 7-8.   The request for review was supplemented with a letter brief on May 14, 2009. Tr. 127-133.   After about 14 months had passed, the Appeals Council on July 20, 2010, concluded that there was no basis upon which to grant Garcia's request for review. Tr. 1-5.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.   Garcia then filed a complaint in this court on September 28, 2010.   Supporting and opposing

---

9.   (...continued)
protective filing date. Tr. 54 and 57. It does seem somewhat odd that the day after the ATV accident, Garcia filed his applications for disability and supplemental security income benefits.

10.   The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 58 and 62.

briefs were submitted and the appeal[11] became ripe for disposition on June 7, 2011, when Garcia filed a reply brief.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176

---

11.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## **SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income

claims.  <u>See</u> 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; <u>Poulos</u>,
474 F.3d at 91-92.  This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[12] (2) has an impairment that is
severe or a combination of impairments that is severe,[13] (3) has
an impairment or combination of impairments that meets or equals
the requirements of a listed impairment,[14] (4) has the residual

---

12.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

13.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  <u>Id.</u>  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

14.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
                                            (continued...)

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an

---

14.  (...continued)
or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

individual is still able to do despite the limitations caused by
his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's
decision and the arguments of counsel, we will review some of the
medical records.

On August 3, 2006, Garcia visited the emergency
department of the Pocono Medical Center, East Stroudsburg,
Pennsylvania, complaining of a right foot injury. Tr. 142-143.  It
was noted that Garcia reported that a "rhino flipped" and
"something landed on [his] right foot." Tr. 143.  The results of a
physical examination of Garcia were essentially normal except the
range of motion in his right lower extremity was limited by pain.
Tr. 144.  However, an inspection of the right lower extremity was
normal with no significant swelling, no deformity and with intact
distal neurovascular status, pulses and capillary refill. Id.  An
x-ray revealed a fracture of the foot. Id.  A splint was applied
to Garcia's right lower extremity and he was provided with
crutches. Id.  Garcia was prescribed Percocet[16] for pain and
discharged from the emergency department to home in a stable
condition. Tr. 145.  Garcia was advised that he had a fracture

---

16.  Percocet, a combination of oxycodone and acetaminophen, is a
narcotic pain reliever. Percocet, Drugs.com, http://www.drugs.
com/percocet.html (Last accessed January 6, 2012).

which typically only requires protection and sufficient time for healing.  Id.  He was further advised to follow-up with Christopher Dipasquale, D.O., an orthopedist, located in East Stroudsburg.  Id.

Two days later on August 5, 2006, Garcia again visited the emergency department of the Pocono Medical Center.  Tr. 138-142 and 153.  Garcia arrived at the emergency department with the splint in place and using crutches, and complaining of pain in the right foot. Tr. 138-139.  Garcia described the pain as dull and moderate. Tr. 139.  He also complained of back pain. Id.  The results of a physical examination of Garcia were essentially normal, including normal range of motion in the neck. Tr. 140.  Garcia did have "paraspinal tenderness in the right lower back area" and a "tender dist[al] [right] foot." Tr. 140.  Garcia's splint was replaced and he was discharged from the emergency department to home in a stable condition with instructions to take his prescriptions, use crutches and follow-up with an orthopedist. Id.

On August 13, 2006, at 11:31 p.m., Garcia visited the emergency department of Beth Israel Medical Center in New York City complaining of right foot pain.  Tr. 157-164.  Garcia's right foot was x-rayed and the splint was replaced.  Tr. 159.  The x-ray of Garcia's right foot on August 14, 2006, revealed that he had

13

"[c]omminuted, displaced fractures at the heads of the 2nd, 3rd, and 4th metatarsal bones."[17] Tr. 165.  Garcia was discharged from the emergency department on August 14, 2006, at 3:33 a.m. in a stable condition. Tr. 164.

On November 3, 2006, Garcia was examined by Joyce Vrabec, D.O., on behalf of the Bureau of Disability Determination. Tr. 167-169.  Dr. Vrabec's report of that examination reveals several significant facts.  Garcia told Dr. Vrabec that he cannot stand for any length of time and cannot bear any weight on his right foot. Tr. 168.  He further told Dr. Vrabec that he had lower back pain but it did not radiate to any area and he denied any problems with the ability to move his upper arms or his hands. Id.  At the time of the examination, Garcia was taking no medications, including anti-inflammatory medicines for his foot pain.  Garcia was also smoking a pack of cigarettes per day.  The results of a physical examination were essentially normal, including full range of motion of extremities with the exception of his right foot. Tr. 169.  Garcia refused to move the right foot in any direction because of alleged pain. Id.  It was noted that

---

17.  The scientific name for the toes is phalanges.  The metatarsals are the long bones of the mid-foot. There are five metatarsal bones and the heads of the metatarsal bones are farthest from the heel of the foot and next to the phalanges (toes). A comminuted fracture is a fracture in which the bone is broken, splintered or crushed into a number of pieces.

Garcia had some mild swelling present on the top of his right foot but there was no discoloration present. Id.   A neurological examination revealed no deficits and normal deep tendon reflexes. Id.  Dr. Vrabec's assessment was that Garcia was "[s]tatus post fractured foot" and that he "obviously has not been compliant with proper followup despite multiple recommendations of ER physicians." Id.

On December 4, 2006, Garcia had an appointment for the first time with Darshan B. Patel, M.D., a family practitioner, located in Mountainhome, Pennsylvania. Tr. 182-183.  Garcia told Dr. Patel that he could not walk more than 1 block because of "metatarsal fractures x 3 by ATV accident" and that he had right flank pain(rib pain). Tr. 182.  When Dr. Patel conducted a review of Garcia's systems[18] Garcia denied the following: headaches, visual changes, dizziness, weakness, neck swelling, chest pain, shortness of breath, abdominal pain, nausea, vomiting, urinary symptoms, rashes and edema. Id.  The results of a physical examination were essentially normal other than right foot tenderness to palpation. Id.  Dr. Patel did note apparently based on his observations and Garcia's subjective complaints that Garcia

_____

18.  "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed January 3, 2012).

was "[u]nable to walk properly due to pain." Id.  Dr. Patel noted
that Garcia was smoking ½ pack of cigarettes per day and counseled
him for "12 minutes on the options of smoking cessation." Tr. 183.
Dr. Patel's assessment was that Garcia suffered from "pain in limb
-metatarsal fx 2-4 with angulation." Id.  Dr. Patel referred
Garcia for an orthopedic and neurological consultation, and
prescribed Diclofenac,[19] Vicodin[20] and Chantix.[21] Id.

On December 15, 2006, Garcia had a neurological
consultation with Slobodan J. Miric, M.D., East Stroudsburg. Tr.
193-195.  Oddly, it appears that Garcia told Dr. Miric that "he
had an accident on March 10, 2006, when he was a passenger next to
a driver in the jeep-type of vehicle and after the vehicle went
downhill, the driver lost control and the vehicle rolled over on
the side.  During that time, the patient hit his head and ended up
on the ground with the vehicle over his right foot." Tr. 193
(emphasis added).  Dr. Miric noted that Garcia smokes ½ pack of

---

19.  Diclofenac is a non-steroidal anti-inflammatory drug.
Diclofenac, Drugs.com, http://www.drugs.com/diclofenac.html (Last
accessed January 6, 2012).

20.  Vicodin, a combination of acetaminophen and hydrocodone, is
a narcotic pain reliever. Vicodin, Drugs.com, http://www.drugs.
com/vicodin.html (Last accessed January 6, 2012).

21.  "Chantix (verenicline) is a smoking cessation medicine.  It
is used together with behavior modification and counseling
support to help [a person] stop smoking." Chantix. Drugs.com,
http://www.drugs.com/chantix.html (Last accessed January 6,
2012).

cigarettes per day, occasionally drinks alcohol and takes Percocet twice a day and Flexeril. Id.  When Dr. Miric conducted a review of Garcia's systems Garcia denied the following: headaches, double vision, palpitations, chest pain, shortness of breath, cough, nausea, vomiting, diarrhea, urinary frequency or urgency, kidney stones, depression, anxiety, insomnia, fevers, loss of weight, lose of appetite, dizziness and numbness.

The results of a neurological examination were essentially normal. Tr. 194.  Garcia's mental status, cranial nerves and coordination were all normal. Id.  A motor examination revealed "full strength in the left arm and left lower extremity." Garcia had no problems on his left side except some limited horizontal motion of the neck to the left. Tr. 195.  The right arm did evidence "some elements of give-way weakness due to pain." Tr. 194.  Garcia apparently had difficulty on the right with the rhomboid muscles which are responsible for the retraction of the scapula (shoulder blade).  He also had difficulty with his right biceps. Id.  However, he had full strength in his hand muscles (instrinsic muscles) and he had full strength with respect to extension of the wrist. Id.  Weakness was observed in Garcia's right foot. Id.  Garcia's reflexes were normal and a sensory examination revealed normal light touch, pinprick and joint position senses. Id.  Examination of the cervical spine revealed

17

tenderness at the C5-C6 level on the right side of the neck and
along the superior margin of the trapezius. Tr. 195.  The motion
of Garcia's neck was limited horizontally more on the left than
the right but the motion of the neck vertically was intact. Id.
Tenderness was observed in the thoracic spine but no swelling of
the skin. Id.  There was some mild swelling in the metatarsal area
of the right foot. Id.

Dr. Miric's assessment was that Garcia suffered from
right brachial plexopathy[22] secondary to the motor vehicle
accident, C5-C6 radiculopathy and status post fracture of the
right metatarsal bone. Id.  Dr. Miric prescribed Percocet, Soma[23]
and Flexeril;[24] referred Garcia for an MRI of the cervical and

---

22. "Brachial plexopathy is pain, decreased movement, or
decreased sensation in the arm and shoulder due to a nerve
problem. . . . Brachial plexus dysfunction (brachial plexopathy) is
a form of peripheral neuropathy. It occurs when there is damage
to the brachial plexus, an area where a nerve bundle from the
spinal cord splits into the individual arm nerves. Damage to the
brachial plexus is usually related to direct injury to the nerve,
stretching injuries (including birth trauma), pressure from
tumors in the area, or damage that results from radiation
therapy."  Brachial Plexopathy, MedlinePlus Medical
Encyclopedia, A service of the U.S. National Library of
Medicine, National Institutes of Health, http://www.nlm.nih.gov
/medlineplus/ency/article/003855.htm (Last accessed January 5,
2012).

23. "Soma is a muscle relaxer that works by blocking pain
sensations between the nerves and the brain." Soma, Drugs.com,
http://www.drugs.com/soma.html (Last accessed January 6, 2012).

24. Flexeril, a muscle relaxant, is used, inter alia,  to treat
                                        (continued...)

thoracic spine and for an EMG/Nerve Conduction Study of the upper extremities; and ordered blood work.  Id.

Garcia also had a follow-up appointment with Dr. Patel on December 15, 2006, regarding his alleged rib pain.  Tr. 180-181. At that appointment Garcia stated that he felt fine except for "[right] sided rib pains."  Id.  When Dr. Patel conducted a review of Garcia's systems Garcia denied the following: headaches, visual changes, dizziness, weakness, neck swelling, chest pain, shortness of breath, abdominal pain, nausea, vomiting, urinary symptoms, rashes or edema.  Id.   There is no indication that Garcia complained of weakness or pain in his right arm, his neck or his right lower extremity.  Id.  The results of a physical examination were essentially normal.  Id.

On December 18, 2006, Garcia had an MRI of the cervical spine which revealed degenerative changes, disk herniation at the C3-4, C4-5, C5-6 and C6-7 levels with mild impingement of the thecal sac,[25] no spinal canal stenosis, mild narrowing of the

_____

24.  (...continued)
pain. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed January 6, 2012).

25.  The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms. The MRI indicated mild impingement.

neural foramina at the C5-6 level on the left side, and no evidence of spinal cord lesion or spinal cord compression. Tr. 202.

On December 21, 2006, Garcia had an x-ray of the right ankle, calcaneus (heel) and foot.  Tr. 166.  The x-rays revealed no fracture, dislocation or bone destruction. Id.

On January 3, 2007, Garcia had a needle electromyography[26] of the upper extremities. Tr. 203.  The results of the examination of the right upper extremity were normal.[27] Id. The results of the examination of the left upper extremity were abnormal and "most consistent with left C5 root irritation" of an acute nature.[28] Id.

On January 17, 2007, Gerald A. Gryczko, M.D., reviewed Garcia's medical records and completed a functional capacity

_____

26.  An electromyography "is a test that checks the health of the muscles and the nerves that control the muscles." Electromyography, MedlinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health, http://www. nlm.nih.gov/medlineplus/ency/article/003929.htm (Last accessed January 5, 2012).  Disorders which cause abnormal results, include brachial plexopathy. Id.

27.  This was the extremity where Dr. Miric allegedly observed "some elements of give-way weakness due to pain" and diagnosed brachial plexopathy. Tr. 194.

28.  As stated earlier, Dr. Miric's examination of the left upper extremity revealed full strength. Tr. 194.  Also, Dr. Miric observed "limited" horizontal movement of the neck on the left without specifying the degree of limited motion. Tr. 195.

assessment on behalf of the Bureau of Disability Determination. Tr. 170-176. Dr. Gryczko concluded that Garcia had the ability to engage in medium work. Tr. 171-174. Dr. Gryczko in a concluding paragraph of his assessment stated as follows: "Of critical importance in determining the credibility of the claimant's statement regarding his symptoms and their effect on his functioning were his medical history, the character of his symptoms, type of treatment he received, the consistency of the evidence and X-ray studies. Also considered was his response to treatment. The description of the symptoms and limitations provided by the claimant throughout the record has been inconsistent and is not persuasive. His description of the severity of his pain is extreme and unsupported by the medical and other evidence of record." Tr. 175.

On January 18, 2007, Garcia had an MRI of the thoracic spine which revealed degenerative changes, disk herniation at the T2-3 level with mild impingement of the thecal sac, no spinal canal stenosis, and no evidence of spinal cord lesion or compression. Tr. 201.

On January 31, 2007, Garcia was admitted to the emergency department of the Pocono Medical Center at 4:23 p.m. after being involved in a motor vehicle accident. Tr. 215-225. Garcia claimed that he was run off the road by a school bus. Tr.

216.   Garcia complained of moderate neck and back pain but denied pain in the following areas: collar bones, shoulders, wrists, hands and fingers. Tr. 217.   Garcia denied an "inability to ambulate/bear weight," denied pain on walking, denied hip pain and denied ankle pain. Id.   Garcia did state that he had knee pain intermittently for 1 hour. Id.   Garcia had no neurological symptoms and his Glasgow Coma Scale total was 15.[29] Id.   The results of a physical examination of Garcia by Richard M. Cornish, M.D., were essentially normal, including the range of motion of his neck was normal and non-tender; his back did not reveal any tenderness to palpation; and his deep tendon reflexes were all

---

29.   The Glasgow Coma Scale is "a quick, practical standardized system for assessing the degree of consciousness in the critically ill and for predicting the duration and ultimate outcome of coma, primarily in patients with head injuries. The system involves eye opening, verbal response, and motor response, all of which are evaluated independently according to a rank order that indicates the level of consciousness and degree of dysfunction. The degree of consciousness is assessed numerically by the best response. The results may be plotted on a graph to provide a visual representation of the improvement, stability, or deterioration of a patient's level of consciousness, which is crucial to predicting the eventual outcome of coma. The sum of the numeric values for each parameter can also be used as an overall objective measurement, with 15 indicative of no impairment, 3 compatible with brain death, and 7 usually accepted as a state of coma. The test score can also function as an indicator for certain diagnostic tests or treatments, such as the need for a computed tomography scan, intracranial pressure monitoring, and intubation. The scale has a high degree of consistency even when used by staff with varied experience." Mosby's Medical Dictionary,__, 8th edition, 2009.

normal. Tr. 219-220.  Cervical spine x-rays were consistent with muscle spasm, but demonstrated no fracture and there was normal disc spacing. Tr. 223.  A lumbar spine x-ray revealed no compression fracture or spondylolisthesis.[30] Tr. 225.  Garcia was discharged from the hospital at 8:15 p.m. in a stable condition. Tr. 218 and 220.  At the time of discharge he was ambulating without assistance. Id.

On February 16, 2007, Garcia had a follow-up appointment with Dr. Miric. Tr. 191-192.  In his report of this appointment Dr. Miric noted that a cervical spine MRI showed mild narrowing of the neural foramen at the C5-6 level on the left and stated that this was consistent with C5 radiculopathy "found with his nerve conduction study." Tr. 191.  In contrast to the examination of December 15, 2006, Dr. Miric allegedly observed "give-way weakness in the left and right arm due to pain." Id.  However, Garcia's muscle tone was normal and his reflexes were symmetric and brisk in the upper and lower extremities. Id.  In addition to prescribing facet blocks (injections), Dr. Miric advised Garcia to

---

30.  "The word spondylolisthesis derives from two parts - spondylo which means spine, and listhesis which means slippage. So, a spondylolisthesis is a forward slip of one vertebra (i.e., one of the 33 bones of the spinal column) relative to another. Spondylolisthesis usually occurs towards the base of your spine in the lumbar area." Spineuniverse.com, Spondylolisthesis: Back Condition and Treatment, http://www.spineuniverse.com/conditions/ spondylolisthesis/spondylolisthesis-back-condition-treatment (Last accessed January 6, 2012).

take anti-inflammatory medications regularly, apply a heating pad, and use massage and light physical therapy. Tr. 192.  In the last sentence of his report of the appointment Dr. Miric stated that Garcia "remains temporarily disabled" without specifying the length of his temporary disability or giving any details as to Garcia's functional capabilities. Id.

On April 18, 2007, Garcia had an appointment with William J. Krywicki, M.D., an orthopedic surgeon. Tr. 187.  Dr. Krywicki stated that Garcia "has not had any type of therapy or any type of an exercise program for the foot." Id.  Dr. Krywicki further noted that Garcia's "sensory exam is normal to the midfoot and forefoot . . . Midfoot motion is normal without pain." Id. Dr. Krywicki stated that Garcia had a healed metatarsal fracture. Id.

On June 28, 2007, Garcia had a follow-up appointment with Dr. Miric regarding his alleged musculoskeletal pain. Tr. 190-191. Dr. Miric observed "giveaway weakness in the left and right arm due to pain" but Garcia's muscle tone was normal and his reflexes were symmetric and brisk. Id.  Dr. Miric continued Garcia's prescriptions for Percocet, Diclofenac, Flexeril and Soma, referred Garcia for an MRI of the lumbar spine and for a pain management consultation, and scheduled a follow-up appointment in 6 weeks.  Id.

24

An MRI of the lumbar spine performed on July 11, 2007, revealed that Garcia had degenerative changes, a disk herniation and disk bulge with impingement on the thecal sac, no spinal canal stenosis, mild narrowing of the neural foramina at the L4-5 and L5-S1 level bilaterally, a small hemangioma in the L1 vertebral body,[31] and no evidence of spinal cord or nerve compression. Tr. 200.

An MRI of the right foot on August 3, 2007, revealed that the metatarsals appeared normal. Tr. 199.

On September 5, 2005, Dr. Miric indicated that Garcia complained of persistent pain, but reported that medications were helpful. Tr. 239. Garcia had spasms at C4-5,C5-6, L4-5 and L5-S1 levels, but normal tone, and symmetric and brisk reflexes. Id. Dr. Miric continued Garcia's prescriptions for Percocet, Diclofenac, Flexeril and Soma. Id.

On November 7, 2007, Dr. Miric reported that "it seems that [Garcia's] pain [is] under reasonable good control with medications." Tr. 238.

---

31. "A spinal hemangioma is a primary, benign tumor most common in the thoracic and lumbar spine. This type of tumor typically affects the vertebral body, but also can affect muscles. The tumor has few symptoms, and is often found on examination for another condition." Scoliosis & Spine Associates, Spinal Tumors, http://www.scoliosisassociates.com/subject.php?pn=spinal-tumors-0 12 (Last accessed January 6, 2012).

X-rays of Garcia's right foot on December 12, 2007, revealed an "[o]ld healed fracture neck fourth left metatarsal" and "[n]o evidence of a new fracture." Tr. 234.

A needle electromyography of the lower extremities conducted on January 2, 2008, was abnormal with respect to the right lower extremity. Tr. 249.   The results were consistent with right L5 root irritation of an acute nature. Id.   The left lower extremity was normal. Id.

At an appointment with Dr. Miric on February 11, 2008, Garcia claimed that he was no longer taking any medications and he was looking forward to continuing with pain management. Tr. 237. Dr. Miric reported that Garcia's reflexes were symmetric and brisk. Tr. 237.   The report of this appointment does mention "some loss of pinprick sensation in the left C5 distribution and also L5 root irritation of the right side." Tr. 237.

On February 26, 2008, Garcia visited the emergency department of Pocono Medical Center complaining of rib pain after he allegedly slipped on ice and fell. Tr. 207-212.   He rated his symptoms as moderate. Tr. 209.   During the visit Garcia denied neck, back, chest and abdominal pain. Id.   It was noted that Garcia had "[n]o Joint pain" and "[n]o Back pain." Tr. 210.   He had normal neck range of motion. Id.   Garcia's Glasgow Coma scale total was 15. Id.   X-rays of the ribs were normal. Id.   At time

26

of his discharge which was the same day as his admission, Garcia ambulated without assistance. Tr. 209.

On March 6, 2008, and April 8, 2008, Dr. Patel noted that Garcia was "comfortable" and "healthy" and had a supple neck. Tr. 253 and 258.

On May 12, 2008, Dr. Miric reported that Garcia had some tenderness in his lumbar spine region, right sacroiliac joint, facet joints, and cervical spine, but had symmetric reflexes. Tr. 236.

On May 19, 2008, a lumbar spine MRI showed no significant interval change from the July 11, 2007, study. Tr. 244 and 293.  Also, a cervical spine MRI of June 10, 2008, showed no significant interval change from the December 18, 2006, study. Tr. 292.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Garcia had not engaged in substantial gainful activity since August 4, 2006, the alleged onset date. Tr. 14.

At step two, the administrative law judge found that Garcia suffers from the following severe impairments: degenerative disc disease of the cervical, thoracic and lumbar

spines, foot pain, left upper extremity C5 and right lower extremity L5 nerve root irritation. Tr. 14.

At step three of the sequential evaluation process the administrative law judge found that Garcia's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16.

In addressing step four of the sequential evaluation process in her decision, the administrative law judge found that Garcia could not perform his past semi-skilled, medium work as a installer for a communications company but that he could perform a limited range of light work (more in line with sedentary work). Tr. 17-21 and 49.  Specifically, the administrative law judge found that Garcia could perform light work as defined in the regulations

> except that he must be permitted to sit and/or stand at will, has a lower right extremity limitation for pushing and/or pulling, can occasionally climb, balance or stoop, but never work on ladders, kneel, crouch or crawl and must avoid temperature extremes, humidity and hazards.  He is also limited to simple routine tasks.

Tr. 17.  In arriving at this residual functional capacity the administrative law judge found that Garcia's statements about his pain and functional limitations were not credible. Tr. 18.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a

vocational expert found that Garcia had the ability to perform work such as bench type packaging, inspecting and assembling, and that there were a significant number of such jobs in the regional, state and national economies. Tr. 22.

The administrative record in this case is 294 pages in length and we have thoroughly reviewed that record.  The administrative law judge did an adequate job of reviewing Garcia's medical history and vocational background in her decision. Tr. 12-22.  Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 16, Brief of Defendant.  Garcia's primary argument is that the administrative law judge erred at step three of the sequential evaluation process when the administrative law judge found that Garcia's impairments did not meet or equal the requirements of Listing 1.04A, Disorders of the Spine.  We find no merit in that argument.

Garcia argues that the relevant Listing is 1.04A-Disorders of the Spine. To satisfy Listing 1.04A, Garcia had the burden of proving that he had a disorder of the spine, (e.g.,herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture) resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root

compression characterized by neuro-anatomic distribution of pain;
limitation of motion of the spine; motor loss (atrophy with
associated muscle weakness or muscle weakness); accompanied by
sensory or reflex loss; and, if there is involvement of the lower
back, with positive straight-leg raising tests in the sitting and
supine position.   20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04
(2011)(emphasis added).

         Garcia has proffered no medical opinion, nor has he
marshaled the evidence in the record, to support his contention
that his condition met or equaled the requirements of a listed
impairment.   Garcia concedes that the record is devoid of a
positive straight-leg raising tests in the sitting and supine
position.   Furthermore, Garcia does not identify, and the record
does not appear to contain, an express finding of nerve root
compression.   Even the EMG results cited by Garcia in his brief
do not constitute alternative means of proving the requirements
of Listing 1.04.   The EMG results only show acute nerve root
irritation, not compression.   Furthermore, Garcia's reflexes were
consistently normal.   Also, the evidence of sensory loss is
insubstantial.   There is one reference to "some loss of pinprick
sensation" but other neurological examinations revealed normal
findings.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §§ 404.1512(c) and 416.912(c).  Garcia failed to provide such evidence. No treating or examining physician provided a statement that Garcia met the requirements of Listing 1.04A.  Also, no treating or examining physician offered an opinion as to how Garcia's impairments limited his functional capabilities or ability to work and the bare medical records do not support Garcia's claim of total disability, including his claim that he met Listing 1.04A.[32]

No physician who treated Garcia indicated that Garcia was totally disabled for the requisite 12 month period required by the statute.  However, Dr. Gryczko, a state agency physician, in January, 2007, reviewed Garcia's medical records and concluded

_____

32.  Listing 1.04A requires "compromise of a nerve root. . . or spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight leg raising (sitting and supine)."

31

that Garcia had the functional ability to engage in at least light work.[33] Tr. 170-175.

Garcia also argues that he established a prima facie case of disability when it was established he could not perform his prior relevant work thus shifting the burden to the Commissioner to prove he could perform other jobs.  This argument begs the question because the Commissioner through the testimony of a vocational expert established that there were other jobs available.  At step five of the sequential evaluation process, the burden of production temporarily shifts to the Commissioner to produce vocational evidence demonstrating that there are a significant number of jobs in the national economy that the claimant, given his residual functional capacity, can perform. Once the Commissioner satisfies this limited burden of production, the burden shifts back to the claimant to prove that the Commissioner cannot rely on the vocational evidence.

Finally, Garcia argues that the administrative law judge inappropriately judged his credibility, including his complaints of pain.  The administrative law judge stated that Garcia's statements concerning the intensity, persistence and

---

33.  Dr. Gryczko found that Garcia could perform medium work. The regulations provide that "[i]f someone can do medium work" they "can do sedentary and light work." 20 C.F.R. §§ 404.1567 and 416.967.

limiting effects of his symptoms were not credible to the extent
that they were inconsistent with the ability to perform work as a
bench packager, assembler, and bench inspector.  The
administrative law judge was not required to accept Garcia's
claims regarding his limitations. See Van Horn v. Schweiker, 717
F.2d 871, 873 (3d Cir. 1983)(providing that credibility
determinations as to a claimant's testimony regarding the
claimant's limitations are for the administrative law judge to
make).  It is well-established that "an [administrative law
judge's] findings based on the credibility of the applicant are
to be accorded great weight and deference, particularly since
[the administrative law judge] is charged with the duty of
observing a witness's demeanor . . . ."  Walters v. Commissioner
of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias
v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th
Cir. 1991)("We defer to the ALJ as trier of fact, the individual
optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge observed
Garcia when he testified at the hearing on August 5, 2008, the
administrative law judge is the one best suited to assess the
credibility of Garcia.

     Our review of the administrative record reveals that the
decision of the Commissioner is supported by substantial

evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g)

affirm the decision of the Commissioner.

       An appropriate order will be entered.


       /s/ William W. Caldwell
       WILLIAM W. CALDWELL
       United States District Judge

Dated: January 5, 2012

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LUIS GARCIA,                          :
                                      :
        Plaintiff                     :      No. 4:10-CV-02012
                                      :
    vs.                               :      (Judge Caldwell)
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
        Defendant                     :

## ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of the Commissioner and against Luis Garcia as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Luis Garcia disability insurance benefits and supplemental security income benefits is affirmed.

3.  The Clerk of Court shall close this case.


 /s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: January 5, 2012